UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:10 CR 17 |
| | ) | |
| GEORGE PABEY | ) | |

## RULINGS ON OBJECTIONS TO PRESENTENCE REPORT

The government has one objection to the Presentence Report and the defendant has three. The court will now address these objections.

### A. Obstruction of Justice Enhancement

The government argues that the Guidelines Manual's § 3C1.1 Obstructing or Impeding the Administration of Justice Enhancement should be applied in this case. This enhancement can be applied if this court finds by a preponderance of the evidence that Mr. Pabey either suborned his wife, Hilda Pabey, to commit perjury or obstructed justice by relying on her testimony for his defense when he knew it was false. *United States v. White,* 240 F.3d 656, 660 (7th Cir. 2001); *United States v. Singleton*, 1998 U.S. App. LEXIS 27626, at *3-6 (7th Cir. Oct. 22, 1998). Since there is evidence to support both reasons for applying the enhancement, the court will discuss its findings for both and will apply the enhancement.

1. <u>Suborning Hilda Pabey's perjury</u>

The Sentencing Commission has provided a non-exhaustive list of examples

of conduct covered by the § 3C1.1 Enhancement. Among them is "committing, suborning, or attempting to suborn perjury." In order to apply this enhancement for Mr. Pabey suborning his wife's testimony, I need to find by a preponderance of the evidence that Mrs. Pabey committed perjury and that Mr. Pabey suborned her perjury.

A witness testifying under oath commits perjury if "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94-96 (1993); *United States v. Johnson,* 612 F.3d 889, 893 (7th Cir. 2010).

A finding of perjury can be based on evidence that the witness's testimony was contradicted by other evidence. *United States v. Savage,* 505 F.3d 754, 764 (7th Cir. 2007). The court may also consider the witness's character and demeanor during her testimony. *United States v. Noland,* 960 F.2d 1384, 1391 (8th Cir. 1992).

In this case, Mrs. Pabey's testimony contradicted documentary evidence presented by the government. First, the government produced Government's Exhibit 26 which included photos of the knobs that were installed on the cabinets at Pabey's house in Gary, plus photos of the same type of knobs from Menards and also a receipt showing that Mr. Camacho purchased fourteen of the same type of

2

knobs on the City of East Chicago's Menards account. When asked about the cabinet knobs during trial, Mrs. Pabey testified: "Oh, the knobs came from my house because I had plenty of knobs at my house." (Hilda Luz Pabey, Trial Tr., Vol 1 p. 51.) The government attorney then showed Mr. Camacho's receipt for fourteen identical knobs to Mrs. Pabey, and asked her if it was just a coincidence that Mr. Camacho appeared to have bought the same knobs with city funds. (*Id.* at 53.) Mrs. Pabey responded: "Must be because they are – those are my knobs." (*Id.*) She stated that the knobs Mr. Camacho bought "could have gone somewhere else. Not my house." (*Id.*) She stated that she "bought specifically a big pack" of knobs because she has a lot of cabinets. (*Id.* at 54.) Thus, Mrs. Pabey persisted with her story that she bought the knobs even though the government had documentary evidence showing that Mr. Camacho bought the knobs with the city's money.

Second, the government presented Government's Exhibit 20 which included photos of two bedrooms in Mr. Pabey's Gary house - one bedroom was painted purple and one was painted blue. The government then presented Government's Exhibit 26 which included receipts showing that Mr. Camacho bought identical blue and purple paint on the City of East Chicago's Menards account. Mrs. Pabey testified that she bought the paint for those two bedrooms at Menards. (Hilda

Pabey, Trial Tr. 55, 57.) She stated: "I'm positive I paid it." (*Id.*) She admitted that she did not have a receipt for the paint, stating: "That would have been when I paid cash." (*Id.*) So, Mrs. Pabey again contradicted the government's evidence, testifying without support that she bought the paint when the receipts showed that Mr. Camacho bought it with the city's money.

Third, with Government's Exhibit 26, the government presented a receipt showing that Mr. Camacho bought a chandelier at Menards for $59.99 on the city's account and a photo showing a matching chandelier installed in Pabey's Gary house. Mrs. Pabey testified that she bought the chandelier that was installed into the Gary house at Menards but did not have a receipt. (Hilda Pabey, Trial Tr. 70-71.) She stated: "I'm pretty sure I paid $25 for it." (*Id.* at 70.) The government attorney asked Mrs. Pabey, "And so you are certain you bought this light on your own with cash?" She answered: "$25, that's all – I was surprised it was $25." (*Id.* at 71.) She stated: "I remember picking it out and buying it." (*Id.* at 76.) Again, Mrs. Pabey insisted that she bought the chandelier when the government's evidence clearly showed that Camacho had bought it on the city's account.

Finally, Mrs. Pabey testified that she regularly visited the Gary house during the workday and that she visited the house most days. (Hilda Pabey, Trial Tr. 36, 71.) She testified that from January to April she never saw Mr. Camacho at

4

the house during the workday, meaning from 7 a.m. to 3 p.m. (*Id.* at 36, 65.) However, Mr. Camacho's cell phone records, presented in Government's Exhibit 41, indicated that he was at the house during the workday on a regular basis. Further, Stojan Novakavic and Angel Acosta, other city workers, testified that Mr. Camacho regularly worked on the house during work hours. (Stojan Novakavic, Trial Tr., Vol. I. p. 251, 258, 267).

Thus, the evidence clearly shows that Mrs. Pabey testified falsely while under oath about material issues in her husband's trial. Whether the materials for the house were paid for by the City of East Chicago and whether Mr. Camacho worked on the house while being paid by the City of East Chicago are material issues in this case. So, on four material issues, Hilda Pabey's testimony directly contradicted documentary evidence presented by the government. She had the opportunity to view that documentary evidence, and she testified in direct contradiction to it.

Further, the trial transcript shows that Mrs. Pabey falsely testified on these issues willfully, with conviction, almost to the point of being combative. Her language was unwavering. She stated that it "**must** be" a coincidence that Mr. Camacho bought the same knobs that were in the Gary house. She stated that she "**specifically**" bought the knobs. She stated that she was "**positive**" that she

bought the chandelier. She explained that she remembered buying the paint because it was in her garage and Mr. Camacho called her about it when she was in Puerto Rico. (Hilda Pabey, Trial Tr. 56.) Her language and demeanor did not indicate that she did not remember things or that she was confused. Rather, her language and demeanor showed that she knowingly and assuredly testified in contradiction to the government's evidence. This supports a finding that any inaccuracies in her testimony were intentional and not a result of confusion, mistake, or faulty memory.

Still, Mr. Pabey argues that Mrs. Pabey's testimony was not perjury because inaccurate testimony can be a result of confusion, mistake, or faulty memory. *Dunnigan*, 507 U.S. at 93. Mr. Pabey argues that Mrs. Pabey testified that she gave money to Mr. Camacho to buy supplies and the government did not present evidence to dispute that testimony. He argues that the receipt evidence only shows that Mr. Camacho did not use the money Mrs. Pabey gave him, and she would not have known that Mr. Camacho did not use her money. However, Mrs. Pabey did not state that she gave Mr. Camacho money to buy the paint, the knobs, or the chandelier. She stated that she bought all of the items directly from Menards herself despite the fact that she had no receipts for those items. And despite the fact that the government had receipts showing that Mr. Camacho bought items

identical to the ones used in the Gary house on the City of East Chicago's account.

Mr. Pabey also argues that because Mr. Camacho was exempt from normal workdays, Mrs. Pabey could have thought that Mr. Camacho was off the clock when she saw him. However, Mr. Camacho's individual payment arrangement with the city is irrelevant to whether Mrs. Pabey testified falsely. Mrs. Pabey testified that she never saw Mr. Camacho at the Gary house from January to April from 7 a.m. to 3 p.m., but the cell phone records and credible testimony from other witnesses show that he was regularly at the house during those times. Thus, Mr. Pabey's arguments that his wife's testimony did not contradict the government's evidence or was not intentionally false is unavailing.

The second question is whether the evidence supports a finding that Mr. Pabey suborned his wife's perjury. The Seventh Circuit has held that a district court can conclude that a defendant suborned perjury when the defendant only called one witness and that witness's testimony was directly contradicted by that of the government's witnesses. 159 F.3d 1106, 1112-13 (7th Cir. 1998). *United States v. Elem*, 88 Fed. Appx. 113, 116 (7th Cir. 2004). In the case at hand, Mrs. Pabey was not Mr. Pabey's only witness. However, her testimony was crucial to his defense.

Further, the Third Circuit's opinion in *United States v. McDowell* illustrates that a finding of subornation can be based on inferences arising from the

defendant's relationship to and access to the witness. 888 F.2d 285, 292 (3d Cir. 1989). In *McDowell*, the Third Circuit determined that it was reasonable to infer that the defendant influenced his son to commit perjury for three reasons. *Id.* First, the only motive the son would have had to lie would have been to protect his father; second, the evidence showed that the father must have talked to his son about the offense; and third, the father had an opportunity to influence his son.

That reasoning applies here. Mrs. Pabey's testimony, if it had been believed, would have greatly assisted in exculpating Mr. Pabey. The court can infer that Mr. Pabey had access to and at least some degree of influence over his wife. Her motive to lie would have been to protect her husband. Therefore, the court finds by a preponderance of the evidence that Mr. Pabey suborned his wife's testimony.

2. <u>Mr. Pabey obstructed justice by relying on his wife's false testimony</u>

Regardless of whether Mr. Pabey suborned his wife's testimony, the court should apply the Section 3C1.1 enhancement for obstruction of justice because the evidence shows that Pabey knowingly based his defense on his wife's perjured testimony. *United States v. Washington*, 171 Fed. Appx. 986, 988-89 (4th Cir. 2006). The Seventh Circuit has determined that the Section 3C1.1 enhancement can be applied if the defendant " intentionally presented false alibi evidence at trial" to distract the jury. *Singleton*, 1998 U.S. App. LEXIS 27626, at *4-6.

The Fourth Circuit's decision in *United States v. Johnson* illustrates how the enhancement for obstruction of justice is appropriate when there is a link between the defendant and his witness's false testimony such as a showing that the defendant knew in advance that the witness's testimony would be false, but he chose to present it anyway. 261 Fed. Appx. 611, 615-616 (4th Cir. 2008). Since Mr. Pabey was involved in the improvements to the Gary house, he knew that his wife's testimony was false. The court can infer that Mr. Pabey either directed or encouraged his attorney to call his wife to the stand. In fact, Mr. Pabey would not have allowed his attorney to call his wife to the stand if he knew that she was going to testify in accordance with the government's evidence. What would be the reason to call her then? Mr. Pabey assented to calling his wife to the stand because he knew that she was going to testify falsely and in direct contradiction to the government's evidence. Further, Mr. Pabey's attorney discussed Mrs. Pabey testimony in his opening statement, showing that Mr. Pabey knew what her testimony was prior to putting her on the stand.

Once Mrs. Pabey testified, Mr. Pabey did not submit a sworn rebuttal stating that his wife's testimony was false. There is no evidence that he pulled his attorney aside and said, we cannot rely on her testimony, it is not correct. He did not do that. What he did was use her testimony in his defense even though he knew it

was false. In fact, Mr. Pabey's lawyer then relied on her testimony in his closing argument. (Closing arguments, Trial Tr. 46.) Therefore, by presenting Mrs. Pabey's false testimony in his defense, Mr. Pabey "evinced a clear attempt to obstruct the administration of justice." *Washington*, 171 Fed. Appx. at 989. Therefore, I find by a preponderance of the evidence that Mrs. Pabey committed perjury and that Mr. Pabey not only suborned his wife's testimony but he further knowingly relied on her false testimony for his defense. So I reject the defendant's and the probation officer's positions, adopt the government's position, and apply the two-level enhancement for obstruction of justice.

I will now turn to the defendant's three objections to the Presentence Report.

**B.     Offense Conduct/ Loss Amount**

In his first objection, the defendant contests the characterization of his offense conduct and the loss amount in the Presentence Report. As I will now explain, I reject the defendant's objections and adopt the positions of the government and the probation officer.

1.     Offense Conduct

In regards to the Presentence Report's description of the offense conduct, defendant objects to the statement that he was "personally present on multiple occasions during the workday" while city employees were painting the Gary

house. He argues that Stojan Novakovic testified that Mr. Pabey was at the house on two or three occasions, one of which was a Saturday. He states that none of the other East Chicago painters or other city workers saw Mr. Pabey and in fact that two of them testified that Mr. Camacho told them that Mr. Pabey would be angry if he knew they were there. From this, Mr. Pabey appears to conclude that there is no evidence that he was at the house on multiple occasions.

The court is completely unpersuaded by Mr. Pabey's argument. First, the jury rejected his story that he did not know the city workers were there. Second, Mr. Novakovic credibly testified that he saw Mr. Pabey at the house three or four times in total and two or three times while he was painting during the workday. (Novakavic, Trial Tr., Vol. I. p. 272-75). Mr. Novakovic also testified that Mr. Pabey saw him painting the house during the workday and that Mr. Pabey knew he was a city worker. This in itself is enough to support the statement that Mr. Pabey was personally present on multiple occasions while painting was taking place during the workday. Third, Mr. Pabey's assertion that none of the other East Chicago workers saw him during the workday is incorrect. Angel Acosta, who was a city worker working at the house during his comp time, testified that he saw Mr. Pabey at the Gary house a few times and that at least one of those times was during the weekday. (Angel Acosta, Trial Tr., Vol. 1 p. 23.) Mr. Acosta also testified that Mr.

Pabey came by the Gary house some days during the workday when Mr. Camacho was there. (*Id.* at 23-24.) So, there is credible evidence showing that Mr. Pabey was at the Gary house on multiple occasions during the workday when city workers were present and working.

2. Loss Amount

Further, I find that the government and the probation officer's calculation of the loss amount at $14,405.14 is supported by the evidence. Pursuant to Section 2B1.1(b)(1) this loss amount is more than $10,000 and less than $30,000, warranting an increase in the offense level by four. To arrive at the figure of $14,405.14, the government includes $7,277.00 for supplies and $7,128.14 in labor costs. The labor costs include 112 hours worked by Mr. Camacho, 4 hours worked by Russell Breger, 180 hours worked by Stojan Novakovic, 16 hours worked by Javier Santos, and 24 hours worked by Adrian Vasquez.

The defendant objects to the hour calculations for Mr. Novakovic and Mr. Camacho. He argues that Mr. Novakovic's testimony that he worked on the house twenty-five days is "patently absurd" and that his work should be estimated to have taken the same time as the other painters. However, Mr. Pabey does not present any evidence to dispute Mr. Novakovic's testimony. As the government points out, Mr. Novakovic testified that he worked thirty days. (Novakavic, Trial

Tr., Vol. I. p. 281.) So a loss calculation based on twenty-five days of his work is conservative and supported by the evidence.

Mr. Pabey also argues that Mr. Camacho's hours should not be counted into the amount of loss because Mr. Camacho was "exempt from normal working hour constraints" and was considered to be working 24-7. This argument is unavailing. As I have previously stated, there is credible evidence that Mr. Pabey saw Mr. Camacho at the Gary house during the workdays. Although Mr. Camacho did not complete a time sheet, he was still being paid by the City of East Chicago and it is reasonable to conclude that he owed his workday time to the city when he had not taken comp time or vacation time.

Mr. Pabey notes that Section 2B1.1 note 3(E) provides that the loss amount should be reduced by any money returned to the victim prior to detection of the offense. He argues that the loss amount should be reduced by the amounts that he and his wife paid to Mr. Camacho and the other workers for supplies and their time. However, he does not argue and there is no evidence that these funds if actually paid were ever returned to the victim, the City of East Chicago. Though Mr. Pabey presented some evidence that he paid Mr. Camacho, that does not mean that he was not paying Mr. Camacho in addition to the city's funds or that Mr. Camacho gave the money back to the city. Once Mr. Pabey approved use of the

13

city resources for his Gary house, it was foreseeable by him that the workers involved in this scheme would keep any money given to them by Mr. Pabey and not return it to the City of East Chicago.

So, the court rejects the defendant's position, adopts the government and the probation officer's positions, and determines that the amount of loss was $14,405.14, requiring a four-level increase under Section 2B1.1(b)(1).

**C.      Aggravating Role - Leader/Organizer**

Next, I agree with the government and the probation officer that Mr. Pabey should receive a four-level enhancement under the Guidelines Manual § 3B1.1 for his role as the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. In opposition to this enhancement, Mr. Pabey argues, as he did at trial, that he did not have knowledge of Mr. Camacho's use of city workers on his Gary house. As the government points out, the jury rejected this argument at trial.

In determining whether a defendant was a leader in a scheme, I need to consider: 1) the exercise of decision making authority, 2) the nature of participation in the commission of the offense, 3) the recruitment of accomplices, 4) the claimed right to a larger share of the fruits of the crime, 5) the degree of participation in planning or organizing the offense, 6) the nature and scope of the illegal activity,

and 7) the degree of control and authority exercised over others.

For a defendant to be properly categorized as a leader or organizer "[a]ll that is required is that the defendant provide leadership and organization for a criminal enterprise comprised of five or more persons and actually control at least one of the participants." *United States v. Blaylock*, 413 F.3d 616, 621 (7th Cir. 2005). He does not have to have controlled all five. *United States v. Kamoga*, 177 F.3d 617, 621 (7th Cir. 1999). The defendant does not even need to know of all of the other participants, the participants need only be "acting according to the organizer's design and in furtherance of [his] plan." *Id.* at 621-22.

As a threshold question, the evidence shows that the scheme involved five or more participants. As the probation officer points out, in addition to Mr. Pabey and Mr. Camacho the evidence at trial identified six other individuals who were involved in the scheme: Javier Santos, Adrian Vasquez, Stojan Novakovic, Russell Breger, and at least two other unnamed East Chicago workers. These men are participants in the crime even though they were not indicted or convicted because they knew that they were employed by the City of East Chicago and were working in the City of Gary on the Mayor's personal house during their work hours. In fact Mr. Novakavic testified that he knew that the work on the Gary house was "something that we shouldn't be doing." (Stojan Novakavic, Trial Tr.,

15

Vol. I. p. 252.)

The government has presented credible evidence that shows that several of the seven factors weigh towards a finding that Mr. Pabey was the leader or organizer of the scheme. First, the evidence allows an inference that Mr. Pabey controlled at least Camacho. Mr. Pabey hired Mr. Camacho to work in the city and he also hired Mr. Camacho's wife to be his secretary. (Hilda Luz Pabey, Trial Tr., Vol. 1. p. 46.) Mr. Camacho went with Mr. Pabey when Mr. Pabey considered whether he should buy the house and determined what work would need to be done to the house. (Angel Acosta, Trial Tr., Vol. 1, p. 7-8.) Mrs. Pabey testified that Mr. Camacho was involved in discussions about repairing the house. (Hilda Luz Pabey, Trial Tr., Vol. 1. p. 15.) Further, Mr. Pabey was Mr. Camacho's boss and Mr. Camacho was the supervisor of the city workers. So, it can be inferred that Mr. Pabey had control over Mr. Camacho and authority over all of the people working on the Gary house.

Second, the nature of Mr. Pabey's participation in the offense shows that he was the leader. *United States v. Toscano,* 2010 U.S. App. LEXIS 22816 (7th Cir. Sept. 23, 2010). He was definitely the boss, above the other city workers involved. He owned the house that was improved. If he had not bought the house and had not been trying to improve it and sell it for his own profit, none of the other men

16

would have had any reason to work on the house. There is also not any evidence that Mr. Pabey paid any of the men for the time they spent working on his house.

Third, Mr. Pabey had the decision-making authority in the scheme. There is credible evidence that Mr. Pabey decided what type of work should be done to the house. East Chicago city worker Angel Acosta testified that Mr. Pabey called him when he was thinking of buying the Gary house and that he, Mr. Pabey, and Mr. Camacho visited the house to see what work would need to be done. (Angel Acosta, Trial Tr. Vol. 1, p. 7-8.) Mr. Acosta testified that Mr. Pabey instructed him as to the work he wanted done to the house including finishing the basement. (*Id.* at 8.) Mr. Acosta also testified that Mr. Pabey came to the house while it was being worked on. (*Id.* at 23.) Mr. Novakovic testified that Mr. Pabey came to the house to check the progress. (Novakavic, Trial Tr., Vol. I. p. 275.) This evidence supports a finding that Mr. Pabey directed and supervised the work done to the house.

Fourth, and very significantly, as the government correctly argues, Mr. Pabey was the only one who stood to gain anything from the scheme. He was to get all of the fruits of the crime. This weighs heavily towards a finding that he was the leader of the scheme.

Mr. Pabey argues that he cannot be considered the leader of the criminal

17

scheme when he supervised the participants in non-criminal activities and was not directly involved in furthering the crime. However, as previously discussed, the government has presented credible evidence that Mr. Pabey owned the house and was involved in the plan to improve it. It has also presented credible evidence that Mr. Pabey did not pay for the labor involved in the improvements to the house. From this it can be inferred that Mr. Pabey knew that Mr. Camacho, whom he hired and had authority over, and other city workers were improving the house while being paid by the City of East Chicago.

So, the evidence amply points to the conclusion that the four-level enhancement for being an organizer or leader of a criminal scheme involving five or more participants appropriately reflects the nature of Mr. Pabey's involvement in this crime, as required to be considered under Section 3B1.1. Therefore, I find by a preponderance of the evidence that Mr. Pabey clearly was the leader or organizer of this scheme. So I reject the defendant's position and adopt the positions of the government and the probation officer. I apply the four-level enhancement under Section 3B1.1(a) of the Guidelines Manual.

**D.     Role Adjustment for Abuse of Position of Trust**

An adjustment under § 3B1.3 of the Guidelines Manual is warranted. For this enhancement to apply, the court must find by a preponderance of the evidence

18

that Mr. Pabey "(1) occupied a position of trust and (2) abused that position in a manner that significantly facilitated the commission or concealment of his offense." *United States v. Ellis*, 440 F.3d 434, 437 (7th Cir. 2006).

There is no dispute that Mr. Pabey occupied a position of trust as the Mayor of East Chicago. Instead, Mr. Pabey argues that the enhancement should not apply because his position as mayor did not significantly facilitate the commission of the crime. He argues that Mr. Camacho was the person who used the city funds to purchase supplies and that he did not use his position as mayor to access or conceal the use of city funds. He argues that other people within the City of East Chicago, the City Controller, and the Head of the Engineering department were responsible for overseeing the use of the engineering department's funds and employees. However, what Mr. Pabey conveniently brushes over is that he was ultimately the supervisor of all of these people. He had control over who occupied these key positions within the City of East Chicago and they all owed him their jobs.

Further, as the government and the probation officer point out, Mr. Camacho and his crew of city workers would not have improved a house for any other citizen the way they did for Mr. Pabey. The house was not even located in the City of East Chicago, it was located in the City of Gary. Apart from the mayor,

19

no East Chicago resident, would have been able to have City of East Chicago workers improve a house that was not located in the City of East Chicago. Mr. Pabey's position as ultimate supervisor of every city worker made it enormously easier for him to command the public workers and the city's resources. In fact, he would not have been able to get city workers to improve a house for him without paying them directly for their work if not for his position as mayor. Here, the voters of the City of East Chicago placed Pabey in a position of trust and he corruptly used that position of trust to channel city resources to his own use. These are circumstances in which application of this enhancement is appropriate. *United States v. Fife*, 471 F.3d 750, 753 (7th Cir. 2006).

So, the court rejects the defendant's position and adopts the positions of the government and the probation officer and applies the two-level enhancement for abuse of a position of trust. After resolution of the objections, Mr. Pabey's total offense level is eighteen, which coupled with a criminal history of I results in an imprisonment range of 27 to 33 months, and a fine range of $6,000.00 to $60,000.

Date: May 5, 2011

        s/James T. Moody
        JUDGE JAMES T. MOODY
        UNITED STATES DISTRICT COURT